MICHAEL RUSSO

   –and–

BRUCE HARRISON

*On Behalf Of Themselves And All
Others Similarly Situated*,

        Plaintiffs,

  v.

BRP US INC.

BOMBARDIER RECREATIONAL
PRODUCTS INC.

   –and–

FICTITIOUS BOMBARDIER
DEFENDANTS A–C

        Defendants.

Case No.: 2:23–cv–01355

---

## AMENDED CLASS ACTION COMPLAINT

---

NOW COME Plaintiffs, Michael Russo ("Russo") and Bruce Harrison ("Harrison"), by their attorneys, Barton Cerjak S.C. and Sauder Schelkopf LLC, on behalf of themselves and all others similarly situated, and for their Amended Class Action Complaint against Defendants, BRP US Inc., Bombardier Recreational Products Inc., and Fictitious BRP Defendants A–C (collectively, "BRP" or "Defendants"), allege and state as follows based on personal knowledge as to their own facts, upon investigation of counsel, and information and belief as to all other matters:

<u>OVERVIEW</u>

1.      As one of the largest producers of recreational products in the world, BRP was at the forefront of designing, manufacturing, and selling three–wheel motorcycles with a unique "Y"

architecture that have taken the power sports industry by storm. Indeed, BRP's three-wheel motorcycles, produced under its Can-Am brand, did what other manufacturers' bikes have had difficulty doing for decades; namely, attract new riders to the marketplace.

2.     In fact, BRP's entry-level motorcycle, the Ryker, is expressly geared for, and marketed towards, beginner riders in an urban environment, as noted in an August 2021 article in *Cycle World* introducing BRP's 2022 models, including the Class Bikes (defined *infra*), and discussing BRP's success in the powersports industry.[1]

3.     Of course, the use of BRP's motorcycles in metropolitan areas increases the risk that these bikes could be subject to motorcycle theft; an increasing problem given the relative ease with which a prospective thief can access any motorcycle's component parts, coupled with size of these machines, which make them easier to move and conceal once stolen.

4.     To ostensibly address this concern, BRP repeatedly represented to their prospective consumers that *all* of its motorcycles, including the Class Bikes, were equipped with a *standard feature* expressly designed to stop motorcycle thieves in their tracks: namely, BRP's D.E.S.S.™ technology, which is a digitally encoded security system that uses an immobilizer and specifically programmed keys for each bike. According to BRP, every motorcycle uses this D.E.S.S.™ technology and comes equipped with two unique keys, which are the only keys that can start a given bike.

5.     As detailed below, however, BRP lied. On information and belief, BRP's 2021, 2022, and 2023 Ryker motorcycles were not equipped with Defendants' D.E.S.S.™ technology despite BRP's representations to the contrary (the "Class Bikes," further discussed *infra*).  On information and belief, supply chain shortages following the COVID-19 pandemic left BRP unable to outfit its

---

[1]     Andrew  Cherney,  "2022  Can-Am  Ryker  Rally  First  Look,"  CYCLE  WORLD, https://www.cycleworld.com/story/bikes/2022-can-am-ryker-rally-first-look-review/ (Aug. 17, 2021).

motorcycles, including the Class Bikes, with Defendants' D.E.S.S.™ technology. But BRP kept selling the motorcycles anyways and continued to represent to their customers—on their website, on their dealers' websites, in their marketing material, and in their owners manuals—that the Class Bikes were protected from theft by DESS technology when BRP plainly knew this was false. Accordingly, this class action is designed to remedy Defendants' sharp dealing.

## THE PARTIES

6.    Plaintiff, Michael Russo, is a Wisconsin citizen whose principal residence is located within this judicial district.

7.    Plaintiff, Bruce Harrison, is a Pennsylvania citizen whose principal residence is located in York, Pennsylvania.

8.    According to the Wisconsin Department of Financial Institution's website, BRP US Inc. is a Delaware Corporation that maintains its principal place of business in Wisconsin, where its United States headquarters is located at 10101 Science Drive, Sturtevant, Wisconsin 53177.

9.    On information and belief, Bombardier Recreational Products Inc. is a foreign corporation that maintains its principal place of business in Canada, where its international headquarters is located at 726 Rue Saint-Joseph, Valcourt, Quebec JOE 2LO, Canada.

10.    On information and belief, Fictitious BRP Defendants A, B, & C are unknown parent, subsidiary, or affiliate entities and/or corporate predecessors of BRP that participated in the design, development, manufacture, distribution, marketing, warranty, sale, service, and repair of the Class Bikes (defined *infra*) that are the subject of this action, including the design and manufacture of the Defect (defined *infra*) equipped on each Class Bike. The pleadings of this action will be amended once the true identities of these entities are revealed.

3

## JURISDICTION AND VENUE

11.     This Court has subject–matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because the aggregate claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this matter is a class action in which individual members of the class are citizens of a state different than BRP and Bombardier. Additionally, Bombardier is a subject or citizen of a foreign state.

12.     Naming Fictitious BRP Defendants A–C does not affect this Court's subject–matter jurisdiction under CAFA's jurisdictional exceptions, *see* 28 U.S.C. §§ 1332(d)(3) & (4), because no entity that would be substituted in for these fictitious parties would be considered a "primary" or a "significant" defendant in the action that would also be a citizen of Wisconsin.

13.     This Court may exercise personal jurisdiction over Defendants because they conduct substantial business in this state, receive substantial compensation and profits from the design, marketing, sales, and servicing of motorcycles and other recreational products that they directly and/or indirectly distributed in this state, and have engaged in various unlawful practices described below, all of which occurred in this state; given each Defendant's contacts with this forum, they are subject to this Court's personal jurisdiction.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because it is the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial part of the property that is the subject of the action is situated.

*Bombardier Recreational Products And Its Can-Am Motorcycle Line*

15.     BRP's roots trace back to the 1930s when Joseph-Armand Bombardier was granted a patent for the first vehicle that could travel on snow, which he developed out of his garage in Valcourt, Quebec and which was subsequently developed into the world's first snowmobile..

16.     In the ensuing decades, BRP—first, as a division of Bombardier and in 2003, as a standalone entity once BRP was spun off—became a force in powersports industry.

17.     BRP is an internationally recognized company that manufactures and distributes its products under the following eight brands: (i) Can-Am Off-Road (off-road motorcycles and all-terrain vehicles); (ii) Can-Am On-Road (on-road motorcycles); (iii) Ski-Doo (snowmobiles); (iv) Sea-Doo (personal watercraft and pontoon boats); (v) Lynx (snowmobiles); (vi) Rotax (powertrain systems); (vii) Manitou (pontoon boats); (viii) Alumacraft (aluminum fishing boats); and (ix) Quintrex (aluminum boats).

18.     Relevant here, BRP's Can-Am motorcycle line dates back to 1973, when BRP first introduced a Can-Am offroad motorcycle designed for endurance racing and motocross.

19.     Despite initial success, however, the Can-Am line began to lose market share to its Japanese competitors, prompting Bombardier to cease production of Can-Am motorcycles in 1987.

20.     By 2007, the Can-Am line had been resurrected and rebranded to sell: (i) BRP's increasingly popular all-terrain vehicles ("ATVs") through the Can-Am Off-Road brand; and (ii) a unique, three-wheel motorcycle with a "Y architecture," known as the Can-Am Spyder,[2] which would be distributed and sold under BRP's Can-Am On-Road brand:

---

[2] "Can-Am 50th Anniversary," BRP, https://can-am.brp.com/on-road/us/en/discover-can-am/can-am-50th-anniversary.html (last visited Oct. 11, 2023).



21.     By May 2015, the Can-Am Spyder had become immensely popular, with BRP manufacturing at least 100,000 motorcycles for distribution.[3]

22.     On information and belief, BRP then began selling the Can-Am Ryker in 2018, which was marketed as a "beginner" bike in the three-wheel motorcycle market.

23.     By 2020, the success of Defendants' Spyder and Ryker models made "Can-Am the #1 brand in the three-wheel motorcycle market," which was resoundingly successful in attracting new motorcycle riders to the industry as *Globe News Wire* reported.[4]

24.     On information and belief, Defendants' motorcycles are manufactured by BRP in Canada, but BRP has designated BRP US Inc. as its United States importer, who is responsible for the distribution, sale and service of these Class Bikes, including administering warranty claims on the Class Bikes, in the United States.

---

[3] "BRP Dealer Pit Bull Powersports Delivers 100,00th Can-Am Spyder to First-Time Owner," BRP, *https://news.brp.com/news-releases/news-release-details/brp-dealer-pit-bull-powersports-delivers-100000th-can-am-spyder* (May 1, 2015, 6:20 PM).

[4] "A League of Its Own: Can-Am is Changing the Face of the On-Road Riding Industry by Attracting New, Younger, and more Diverse Riders, GLOBENEWSWIRE, *https://www.globenewswire.com/en/news-release/2020/10/01/2102682/0/en/A-League-of-Its-Own-Can-Am-is-Changing-the-Face-of-the-On-Road-Riding-Industry-by-Attracting-New-Younger-and-more-Diverse-Riders.html* (Oct. 1, 2020, 6:30 PM CST).

### Defendants Market, Distribute, And Sell Their Can-Am Motorcycles
### Through A Network Of Authorized Dealers In The U.S.

25.     Defendants maintain an interactive, consumer-facing website, which allows prospective buyers to research the various model lines they offer for sale.

26.     Defendants market, distribute, sell, and service their motorcycles in the United States through a network of authorized dealerships that, on information and belief, are imported by BRP US.

27.     On information and belief, Defendants—in furtherance of their relationship with their dealers—control details regarding these dealers' operations through various written agreements, including by: (i) granting each dealer a license to use BRP's trademarks and intellectual property; (ii) furnishing each dealer with marketing material to assist in the sale of their motorcycles; (iii) authorizing and approving any dealer-specific marketing material; (iv) providing training to dealership personnel to assist in their sales activities; (v) hosting and/or providing assistance to build and maintain the dealers' websites on which Defendants' motorcycles are marketed to prospective consumers; and (vi) prohibiting dealers from engaging in activities that detract from the BRP brand or undermine the sales of Defendants' bikes, including the Class Bikes.

28.     In addition to the advertising materials tendered to their authorized dealers, Defendants' marketing campaign includes a plethora of information offered on their respective websites, social media accounts, and news releases through which Defendants make representations lauding the Class Bikes' innovative design, safety, and security.

29.     Additionally, Defendants' authorized dealers are responsible for furnishing to each consumer the BRP warranty accompanying the sale of each Can-Am product, which is set forth in the Can-Am Operator's Guide. As Defendants' warranty on the Class Bikes makes clear, the

7

beneficiaries of the express warranties furnished with each motorcycle are the consumers themselves—not the dealerships, which serve as the intermediary through which consumers acquire Defendants' motorcycles.

30.     Indeed, on information and belief, Defendants' authorized dealers expressly disclaim providing any warranty on the sale or lease of Defendants' motorcycles.

31.     Of course, an authorized dealer has no need for a warranty to address and receive remuneration for any defects in the motorcycles they receive from Defendants. The National Traffic and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101 *et seq.* (the "Safety Act"), makes this point clear because it obligates manufacturers and distributors like Defendants to repurchase or repair any defective vehicle before its dealers sell the vehicle to a consumer:

> **(a) Actions Required of Manufacturers and Distributors.** If, after a manufacturer or distributor sells a motor vehicle or motor vehicle equipment to a distributor or dealer and before the distributor or dealer sells the vehicle or equipment, it is decided that the vehicle or equipment contains a defect related to motor vehicle safety or does not comply with applicable motor vehicle safety standards prescribed under this chapter—
>
> (1) the *manufacturer or distributor immediately shall repurchase the vehicle or equipment at the price paid by the distributor or dealer*, plus transportation charges and reasonable reimbursement of at least one percent a month of the price paid prorated from the date of notice of noncompliance or defect to the date of repurchase; *or*
>
> (2) *if a vehicle, the manufacturer or distributor immediately shall give to the distributor or dealer* at the manufacturer's or distributor's own expense, *the part or equipment needed to make the vehicle comply with the standards or correct the defect.*

49 U.S.C. § 30116 (emphasis added).

32.     The Wisconsin Motor Vehicle Dealership Law ("MVDL"), *see* Wis. Stat. §§ 218.0101 *et seq.*, which licenses Defendants' authorized dealerships as well as Defendants themselves, further supports this point. Consistent with each dealer's role as the conduit through which Defendants sell

8

their motorcycles to consumers throughout the state, the MVDL requires Defendants to indemnify their dealers in connection with any disputes concerning the dealers' unwitting distribution of defective products. Wis. Stat. § 218.0128.

33.     Likewise, the Pennsylvania Board of Vehicles Act ("PBVA"), *see* 63 P.S. §§ 818.101 *et seq.*, which also licenses Defendants and their authorized dealerships, provides that a manufacturer or distributor of motor vehicles violates the PBVA by, *inter alia*: (i) "Unfairly discriminat[ing] among its new vehicle dealers with respect to warranty . . . or any other service required by the manufacturer or distributor with regard to labor or parts reimbursement; and (ii) "Fail[ing] to indemnify its franchised dealers . . . against any judgment for damages . . . arising out of complaints, claims or lawsuits, including, but not limited to, strict liability, negligence, misrepresentation, express or implied warranty or rescission of the sale . . . to the extent that  the judgment or settlement relates solely to the alleged defective or negligent functions by the manufacturer or distributor beyond the control of the dealer." *Id.* §§ 818.310(b)(2), (8).

34.     In short, these laws make plain that Defendants are the parties legally responsible for ensuring compliance with their warranty on their products, including the Class Bikes, given the dealer distribution model through which prospective customer buy Defendants' motorcycles.

### Defendants Market The Class Bikes As Coming Equipped With A Cutting–Edge Anti–Theft System Known As D.E.S.S.™

35.     As noted above, Defendants introduced their Ryker line of motorcycles in 2018 to serve as an introductory complement to the Spyder line, which was marketed towards more experienced riders.

36.     For instance, on information and belief, the Ryker: (i) is designed with a lower center of gravity and a lower weight, making it much easier to maneuver; (ii) comes equipped with a

9

continuously variable transmission (CVT), so that newer drivers do not need switch gears while accelerating and decelerating; and (iii) is designed to be turned like a car or an ATV, which prohibits Ryker users from leaning into turns like a traditional motorcycle user.

37.     Defendants also claim that all Ryker motorcycles are outfitted with a unique anti-theft device known as a Radio Frequency Digitally Encoded Security System ("DESS"), which they tout as proprietary software that they trademarked under the D.E.S.S.™ moniker, as reflected in Defendants' 2022 Operator's Guide accompanying the Class Bikes, which is also available[5] on their website (hereafter, the "Operator's Guide" or the "Guide"):

<table>
<tr><td>

™® Trademarks of BRP or its affiliates.
This is a non-exhaustive list of trademarks that are the property of Bombardier Recreational Products Inc. or its affiliates:

| | | |
|---|---|---|
| ACE™ | Can-Am® | D.E.S.S.™ |
| ROTAX® | RYKER® | XPS™ |

All rights reserved. No parts of this operator's guide may be reproduced in any form without the prior written permission of Bombardier Recreational Products Inc.
©Bombardier Recreational Products Inc. (BRP) 2021

</td></tr>
</table>

(*See* Guide at 2/204.)

38.     On information and belief, Defendants' D.E.S.S.™ technology is an immobilizer system that uses a microchip within each vehicle key that has a unique and specific radio frequency. This unique and specific radio frequency must then be specifically programmed to the Engine Control Unit ("ECU") of a specific vehicle for that vehicle to be operated. As a result, a properly operating DESS system would allow only a specific DESS key—with a unique and previously

---

[5] "Can-Am Ryker," BRP
https://www.operatorsguides.brp.com/public/tmp/219002179.RYKER%20MY22%20REV.A.WEB.pdf (last visited Oct. 11, 2023).

programed radio frequency (and recognized by a matching ECU)—to start and permit the operation of a given vehicle.

39.     But unlike other motorcycles—including Can-Am's Spyder line—the Rykers do not come equipped with a traditional key, where one starts the motorcycle by inserting a standard key into a turn-key ignition.

40.     Rather, the Can-Am Ryker Operator's Guide explains that each Ryker comes equipped with a "DESS Post" and two "DESS Keys," which were delivered with the vehicle. One of the DESS Keys is then inserted onto the DESS Post to start the Ryker:



(*See* Guide, *supra* n.5 at 26/204.)

41.     This is why the Operator's Guide accompanying Defendants' Ryker line of motorcycles explains that: (i) the DESS key "is required to start the vehicle[;]" (ii) if a Ryker owner losses a DESS key, he or she will "need the spare key to restart the vehicle[;]" and (iii) instructs an owner who loses his or her key to visit a "dealer to buy a new key and have it programmed."

42.     On information and belief, Defendants use this unique DESS Key and Post system on the Rykers because they are also equipped with a "learning key" for novice motorcycle riders,

which "limits the speed of the vehicle for first time users and less experienced operators to learn how to operate the vehicle while gaining the necessary confidence and control."

43. Indeed, it appears that Defendants utilize the same D.E.S.S.™ technology and unique key/post system as an enhanced security feature on a variety of their products apart from the Can–Am Ryker line. For example, the same D.E.S.S.™ technology is available as a "safety accessory" for the Can–Am Off–Road line of ATVs[6] on its website:



44. As Defendants' website reflects, the DESS keys furnished with this safety upgrade allow an ATV driver to use a different key to decrease its speed, thereby making it safer for inexperienced users to learn how to operate an ATV as its speed is limited.

---

[6] "Digitally Encoded Security System (D.E.S.S.TM) Keys," BRP, *https://can-am-shop.brp.com/off-road/us/en/715002458-digitally-encoded-security-system-d-e-s-s-tm-keys.html* (lasted visited Sept. 27, 2023).

12

45.     Defendants' website[7] also contains a video touting its D.E.S.S.™ technology as a "*top secret antitheft protection for your vehicle*" and explaining why DESS keys are used for its high–performance vehicles:



46.     The website also extols the benefits one receives when it upgrades to Defendants' "top secret" D.E.S.S.™ technology, including but not limited to: (i) top-security anti-theft protection for your vehicle; (ii) encrypted chip technology that restricts access to your vehicle's electronic ignition system; and (iii) one vehicle/one code per D.E.S.S.™ system. The website[8] also instructs a prospective buyer to contact his or her local authorized dealer for more information:

---

[7] *Id.*

[8] *Id.*



**OVERVIEW**

Please read the specifications below. If more information is required, please contact your local dealer.

**SPECIFICATIONS**

- Top-security anti-theft protection for your vehicle.
- Encrypted chip technology restricts access to your vehicle's electronic ignition system.
- One vehicle/One code.
- A vibration/Shock-resistant ball-and-socket design that ensures a reliable connection.
- Comes with 3 programmable keys:
- Work key: Limits vehicle speed to 40 kph (25 mph) but does not limit engine torque.
- Normal key:
- Defender models: Limits vehicle speed to 70 kph (44 mph) and 10% torque reduction.
- Maverick Trail & Maverick Sport models: Limits vehicle speed to 70 kph (44 mph) and 50% torque reduction.
- Performance key: No restrictions.

| FEATURES DESCRIPTION | <ul><li>Top-security anti-theft protection for your vehicle.</li><li>Encrypted chip technology restricts access to your vehicle's electronic ignition system.</li><li>One vehicle/One code.</li><li>A vibration/Shock-resistant ball-and-socket design that ensures a reliable connection.</li><li>Comes with 3 programmable keys:</li><li>Work key: Limits vehicle speed to 40 kph (25 mph) but does not limit engine torque.</li><li>Normal key:</li><li>Defender models: Limits vehicle speed to 70 kph (44 mph) and 10% torque reduction.</li><li>Maverick Trail & Maverick Sport models: Limits vehicle speed to 70 kph (44 mph) and 50% torque reduction.</li><li>Performance key: No restrictions.</li></ul> |
| --- | --- |

47.     Unlike Defendants' ATVs, however—where the D.E.S.S.™ technology is sold as a "safety accessory" to these Can-Am Off-Road vehicles—Defendants represent to the consuming public that its D.E.S.S.™ technology comes standard across all model lines of Can-Am Ryker and Spyder motorcycles, including the Class Bikes identified below.

48.     Defendants' website[9] also contains a search function wherein prospective customers can locate an authorized dealer that sells Defendants' motorcycles:



---

[9] "Dealer Near Me: Select the Type of Ride You Want to Find a Dealer For," BRP, *https://can-am.brp.com/us/en/dealer-near-me.html* (last visited Sept. 27, 2023).

14

49.     A prospective consumer can enter his or her address on Defendants' website to then locate the authorized dealers in the area.

50.     Defendants' website also provides the names, phone numbers, and websites of each authorized dealer in the area, so that a given consumer can view the inventory of Defendants' motorcycles that are available on each authorized dealer's website.

51.     As noted above, on information and belief, Defendants assist their authorized dealers in creating these dealers' websites and/or providing the requisite information about the Can–Am motorcycle inventory available at each dealer's location.

52.     On information and belief, and consistent with each dealer's role as a conduit through which BRP's customers purchase their motorcycles, including the Class Bikes, Defendants review, authorize, and approve of the representations that their authorized dealers make about these motorcycles to ensure the uniformity and ostensible accuracy of these marketing materials.

53.     Indeed, a sampling of Defendants' authorized dealers' respective websites reveals that they provide the same information about each Can–Am motorcycle a given dealer has in stock, including the specifications of each item of inventory.

54.     Relevant here, Defendants' authorized dealers uniformly represent that the available inventory of Class Bikes for sale were equipped with Defendants' D.E.S.S.™ technology.

55.     For example, Defendants' website contains links to access the website of its entire dealer network in Wisconsin, including Cedar Creek Motorsports ("Cedar Creek"), the authorized dealer from which Russo purchased his 2022 Ryker. (*See infra.*)

15

56. Cedar Creek's website provides a list of the available inventory at its dealership, such as the 2022 Ryker Rally Rotax 900 ACE depicted below[10] that was for sale in August 2023:



57. When a prospective consumer clicks on the "View Details" tab, Cedar Creek's website provides additional information about a given motorcycle, including the "specifications" with which it is equipped.

58. The motorcycle's "features" are then catalogued under the "specifications" tab wherein Defendants and Cedar Creek affirmatively represent that this 2022 Ryker is outfitted with Defendants' D.E.S.S.™ technology:

| Lights and Safety | |
|---|---|
| Safety Features | SCS: Stability Control System \| TCS: Traction Control System \| ABS: Anti-Lock Braking System \| HHC: Hill Hold Control |
| Features | Main functions: Speedometer, tachometer, odometer, trips, distance to empty, engine lights, fuel gauge, clock, ECO mode and Rally mode \| Anti-theft system: Digitally Encoded Security System (D.E.S.S.™) |
| Instrumentation | 4.5 in. (11.4 cm) digital display |
| Warranty | Factory: 1-year BRP limited warranty with 1-year roadside assistance \| Extended Service Terms: B.E.S.T. terms available from 12 to 36 months with roadside assistance |

---

[10] "Used and New Can-Am Ryker for Sale Near Milwaukee, WI," CEDAR CREEK MOTORSPORTS, https://www.cedarcreekmotorsports.com/-xallinventory?sq=Ryker#page=xallinventory&sq=Ryker On information and belief, Defendants' dealers, including Cedar Creek, constantly updated their websites to reflect currently available inventory, such that the links below may identify motorcycles that have been sold. Copies of these listing were thus printed and maintained for us in the proceedings.

16

59. Similarly, one of Defendants' dealers in Illinois—Jim Potts Motor Group, LTD in Woodstock, Illinois ("JPMG")—maintains a virtually identical website whereby consumers can obtain information regarding the Can-Am motorcycles JPMG has in stock, such as the 2022 Ryker Rally Rotax 900 ACE[11] identified below:



60. As with Cedar Creek's website, JPMG's website has an identical "view details" tab,[12] which identifies each motorcycle's specifications, including Defendants/JPMG's representations that Defendants' 2022 Rykers come equipped with Defendants' D.E.S.S.™ technology:



---

[11] "3-Wheel Motorcycles for Sale in Woodstock, IL," JIM PORTS MOTOR GROUP, https://www.jimpottsmotorgroup.com/default.asp?page=xAllInventory#page=xAllInventory&p=3&vt=motorcycle%20%2F%20scooter (last visited October 11, 2023).

[12] "2022 Can-Am® Ryker Rally Rotax 900 ACE," JIM PORTS MOTOR GROUP, https://www.jimpottsmotorgroup.com/default.asp?page=xInventoryDetail&id=12519352&p=3&s=(Sort%20By)&d=D&vt=motorcycle%20%2F%20scooter&fr=xAllInventory (last visited Oct. 11, 2023).

17

61.　　Similarly, one of Defendants' dealers in Pennsylvania—Don's Cycle Kawasaki in Hallam, Pennsylvania ("Don's Cycle")—maintains a virtually identical website whereby consumers can obtain information regarding the Can-Am motorcycles Don's Cycle has in stock, such as the 2023 Ryker Sport Rotax 900 ACE[13] identified below:



62.　　Don's Cycle's website has an identical "view details" tab,[14] which identifies each motorcycle's specifications, including Defendants/JPMG's representations that Defendants' 2022 Rykers come equipped with Defendants' D.E.S.S.™ technology:

| Lights and Safety | |
|---|---|
| Safety Features | SCS: Stability Control System \| TCS: Traction Control System \| ABS: Anti-Lock Braking System \| Anti-theft System: Digitally Encoded Security System (D.E.S.S.™) \| HHC: Hill Hold Control |
| Features | Main functions: Speedometer, tachometer, odometer, trips, distance to empty, engine lights, fuel gauge, clock, ECO mode and Sport mode |
| Instrumentation | 4.5 in. (11.4 cm) digital display |
| Warranty | Factory: 1-year BRP limited warranty with 1-year roadside assistance \| Extended Service Terms: B.E.S.T. terms available from 12 to 36 months with roadside assistance |

---

[13]　"Powersports Vehicles For Sale in York and Hallam, PA," DON'S CYCLE, https://www.donskawasaki.com/default.asp?page=xAllInventory&p=1&s=%28Sort+By%29&make=can%2Dam&d=D&sq=Ryker&vt=motorcycle+%2F+scooter&year=2023&fr=xAllInventory&unitid=14447497#page=xAllInventory&sq=Ryker&vt=motorcycle%20%2F%20scooter&year=2023&make=can-am (last visited Oct. 11, 2023).

[14]　"2023 Can-Am® Ryker Sport Rotax 900 ACE Classic Panels," DON'S CYCLE, https://www.donskawasaki.com/default.asp?page=xInventoryDetail&id=14447497&p=1&make=can-am&s=(Sort%20By)&d=D&sq=Ryker&vt=motorcycle%20%2F%20scooter&year=2023&fr=xallinventory (last visited Oct. 11, 2023).

63. On information and belief, the uniformity of Defendants' dealer websites across the country—in both the appearance of each site and the content that each provides about Defendants' motorcycles—means that Defendants play an integral role in marketing their products vis-à-vis their authorized dealers, including Defendants' approval of the representations on each dealer's sites regarding Defendants' D.E.S.S.™ technology.

64. On information and belief, Defendants developed, marketed, and sold the virtues of this D.E.S.S.™ technology—including by touting its inclusion as a standard feature on all Ryker and Spyder motorcycle lines, including the Class Bikes—given the increased possibility of motorcycle thefts with Defendants' vehicles, which: (i) have become immensely popular over last few years; and (ii) are predominantly being used in metropolitan areas (as opposed to off-roading in rural areas).

65. Indeed, since 2019, motorcycle thefts have increased considerably and consistently. According to statistics compiled by the National Insurance Crime Bureau (NICB), thefts increased by 30% from 2019 to 2020, by 26% from 2019 to 2021, and by an additional 7% from 2021 to 2022.[15] After all, motorcycles have proven to be easier to steal given their relative ease of access and harder for law enforcement agencies to recover. In 2022, for example, the NICB found that of the approximately 52,000 motorcycles stolen, only 42% were ever found.[16]

66. Moreover, in August of 2022, David J. Glawe, President and CEO of NICB, commented on these trends, explaining that while "motorcycles are expensive and more difficult to

---

[15] *See* "Motorcycle Thefts Surge By 30 Percent In 2020," NICB, https://www.nicb.org/news/news-releases/motorcycle-thefts-surge-30-percent-2020 (Aug. 10, 2021); "Protect Your Ride! Motorcycle Thefts Are On The Rise For Second Year In A Row," NICB, https://www.nicb.org/news/news-releases/protect-your-ride-motorcycle-thefts-are-rise-second-year-row (Aug. 5, 2022); "Lock Up Your Bikes – Motorcycle Thefts Rise for the Third Consecutive Year," https://www.nicb.org/news/news-releases/lock-your-bikes-motorcycle-thefts-rise-third-consecutive-year (Aug. 3, 2023).

[16] *See* "Protect Your Ride! Motorcycle Thefts Are On the Rise For Second Year In A Row," note 15, *supra*.

19

secure than other vehicles, making them prime targets for thieves[,] we continue to urge all riders to take steps to protect their property."[17]

67. On information and belief, Defendants sought to capitalize on the attention that motorcycle theft has been receiving by ostensibly positioning their products, including the Class Bikes, as uniquely equipped with technology that prevents motorcycle theft.

### The Class Bikes Are Not Equipped With DESS Immobilizer Technology Despite Defendants' Representations To The Contrary

68. On information and belief, the Class Bikes at issue encompass all 2021–2023 model year Can-Am Ryker motorcycles that are outfitted with a unique key/post ignition system, but which Defendants failed to equip with the necessary microchip immobilizers during the manufacturing process of the Class Bikes as required to make their D.E.S.S.™ technology work properly (the "Defect").

69. As a result, Defendants' D.E.S.S.™ technology does not function as advertised or intended since the keys for the Class Bikes are unable to communicate with the engine control unit.

70. Indeed, if Defendants' D.E.S.S.™ technology that they represented was installed on Class Bikes operated as advertised and intended, only the specific key associated with a given Class Bike would be able to communicate with the ECU to start the motorcycle.

71. Because Defendants failed to outfit the Class Bikes with the necessary microchips, however, the D.E.S.S.™ system does not function as an anti-theft protection system and any Ryker key can start any Class Bike. As a result, extra keys (or stolen keys) can be used to start (and steal) any Class Bike.

---

[17] *See id.*

72.     The magnitude of this problem is now circulating on social media and throughout the Ryker–owner community, as demonstrated through the following collection of YouTube and other social media posts:



(Available at: *https://www.youtube.com/watch?v=NgRbvYvhfnY*.)



(Available at: *https://www.youtube.com/watch?v=JJM569Mu2I0*.)



(Available at: *https://www.youtube.com/watch?v=Nrd_u9DO2RE*.)



3 Wheel InVasion SoCal · Join
Ed Mendez · October 5, 2022 · ⊙

Heads up people if you have a newer ryker example a 2022 your Ryker can be started with ANY Ryker key. I proved this myself using my 2019 keyfob starting another members 2022 Ryker at our last meet. This is an extremely absurd defect by Can Am. If you leave your Ryker unattended you risk your Ryker getting stolen. I use a Kryptonite heavy duty bike chain on my Ryker in addition to the parking lock which I installed however that parking lock can easily be defeated. If you have a newer Ryker I'd advise you to purchase some type of theft protection.....This is absolutely absurd and a huge mistake by Can Am.

Hey just a heads up. My bike was stolen lastnight. Be careful the 2022 can be started with any key. Dealership lied to me and im filing a lawsuit against BRP and can am.

👍😮 6                                    3 comments

👍 Like          💬 Comment          ↪ Share

(Available at: https://www.facebook.com/groups/296500218566366/.)

73.     While the individuals making these videos and/or posts were largely unaware of exactly *why* the key of any Class Bike—and even the keys of previous models—could start any other Class Bike, knowledge of the defect was perfused throughout the public sphere and further enabled criminal activity.

74.     The pervasiveness of this problem is also growing, for it appears that not only can any Ryker key start any Class Bike, but *any magnet* can also be run across the ignition area of a Class Bike to also start the motorcycle—even without a Ryker key. Thus, a prospective thief needs only a magnet to start a Class Bike and drive it away.

75.     Suffice it to say, if Defendants' D.E.S.S.™ technology was functioning as advertised and intended, a magnet would not be able to start any Class Bike.

76.    Once more, knowledge of this defect is observable through contemporary social media posts, as demonstrated below:



77.    On information and belief, the Defect is present in each model year of Class Bike noted above, which are also advertised in an identical and/or substantially similar way; specifically, Defendants claimed that the Class Bikes were equipped with their unique D.E.S.S.™ technology to prevent motorcycle theft when Defendants knew this was not true.

78.    On information and belief, Defendants knew that the Class Bikes were not outfitted with their D.E.S.S.™ technology given the supply chain shortage that affected the United States in the wake of the COVID-19 pandemic but kept selling the Class Bikes as if they were outfitted with this technology.

79.    On information and belief, Defendants made this conscious decision to misrepresent to their customers the technology with which the Class Bikes were equipped because waiting to install their D.E.S.S.™ technology would have significantly inhibited sales.

80. Accordingly, Defendants knowingly foisted this risk on owners of the Class Bikes without providing them a meaningful choice.

*Defendants' Ostensible Warranty Disclaimers & Limitations Covering*
*The Class Bikes Are Inapplicable And Unconscionable*

81. As noted above, Defendants repeatedly touted their D.E.S.S.™ technology as a standard feature on the Class Bikes designed to protect these motorcycles from being stolen.

82. Defendants made these representations on their website, in various pieces of marketing material, and in the Ryker Operator's Guide furnished with each Class Bike.

83. The Ryker Operator's Guide also contains Defendants' express warranty that accompanies each Class Bike, which much be furnished to prospective consumers in pre-sale in compliance with the MMWA's implementing regulations. *See* 16 C.F.R. § 702.

84. Accordingly, Defendants' myriad representations that each Class Bike comes equipped with D.E.S.S.™ technology as a standard feature is an affirmation of fact that Defendants warranted because it relates to the Class Bikes sold and describes that they will conform to the above-referenced descriptions. *See*, *e.g.*, U.C.C. § 2-313(1)(a)-(b).

85. Accordingly, to the extent Defendants claim that any warranty disclaimer operates to bar coverage, the Uniform Commercial Code forecloses this result. *See* U.C.C. § 2-316(1).

86. Likewise, any attempt to limit Defendants' exposure by disclaiming incidental and consequential damages also fails its essential purpose and is unconscionable under the circumstances. Thus, these remedy limitations are equally unenforceable. *See*, *e.g.*, *Bieda v. CNH Indus. America, LLC*, 518 F. Supp. 3d 863, 873 (W.D. Pa. 2021) (finding unconscionability "where prior to [buyer's] purchase, [seller] knew of a fundamental flaw in the [product's] hydraulic system that would prevent it from operating as intended").

*Russo's Motorcycle Is Stolen From His Employer's
Parking Lot Weeks After He Purchased It*

87.     On April 22, 2023, Russo purchased a new, 2022 Can-Am Ryker Sport from one of Defendants' authorized dealers, International Motor Sports Inc. d/b/a Cedar Creek, located at 7518 Highway 60, Cedarburg, WI 53012.

88.     Russo went to Cedar Creek knowing that he wanted to purchase a Ryker because he was already familiar with the Can-Am brand given the research he conducted before he decided to make his purchase.

89.     One of Russo's co-workers had a Can-Am motorcycle and Russo thought they were cool, so he visited Defendants' website to learn more about the motorcycles that BRP sold.

90.     Russo also visited Cedar Creek's website, which provides information, photos, and specifications of the motorcycles in its inventory, including the 2022 Ryker that Russo ultimately purchased.

91.     Consistent with the above-referenced, exemplar representations, Cedar Creek's website also represented that the 2022 Ryker motorcycles in its inventory, including the motorcycle Russo ultimately purchased, came equipped with Defendants' D.E.S.S.™ technology.

92.     At no time prior to Russo purchasing his 2022 Ryker Sport, however, did Defendants—either directly or through Cedar Creek—inform Russo that despite Defendants' myriad representations touting that their motorcycles were equipped with standard D.E.S.S.™ technology, this was in-fact untrue; specifically, these representations were materially false because any Ryker key could be used to start any Class Bike, including the 2022 Ryker that Russo ultimately purchased.

93. As detailed herein, Defendants made these material misrepresentations despite their knowledge to the contrary, as evidenced by the number of reports complaining about the *lack* of D.E.S.S.™ technology that not only pre-date Russo's purchase, but which poses a much greater risk that the Class Bikes can be stolen.

94. Likewise, at no time prior to Russo buying his 2022 Ryker, did Defendants—either directly or through their dealer, Cedar Creek—inform him about: (i) the safety concerns posed by the Defect; (ii) the increased likelihood that his Ryker would be stolen because of the Defect; or (iii) the fact Defendants and Cedar Creek would disclaim liability flowing from the Defect as a result of the theft.

95. All these facts were material to Russo's decision to buy his 2022 Ryker; had he been aware of these facts, he would have purchased a different make of motorcycle altogether.

96. Absent this knowledge, and in reliance on Defendants' contradictory representations in their marketing material and Operator's Guide, Russo purchased his 2022 Ryker Sport (VIN: 3JB2JEG25NJ005021) for $12,087.00.

97. To acquire his 2022 Ryker, Russo made a $2,000 down payment and agreed to finance the remaining balance of $10,958.25 by making seventy-two monthly installments of $198.76, beginning on June 6, 2023.

98. Russo also paid an additional $871.25 in taxes and fees in connection with his purchase of the 2022 Ryker.

99. At the time of his purchase, Cedar Creek also provided him with two, ostensibly unique DESS keys that were supposed to be specifically programmed to his motorcycle, just as the Operator's Guide represented.

26

100.    On information and belief, the component parts of Russo's motorcycle comprising the Defect did not substantially change from the time the vehicle left Defendants' control to the day Russo bought it; nor did Russo modify any of these component parts during his short tenure as the 2022 Ryker's owner.

101.    On July 2, 2023, at around 10:00 p.m., Russo drove his 2022 Ryker to work for his third shift at Packaging Corporation of America ("PCA"), which is located on 56th Street and Good Hope Road in Milwaukee.

102.    Around midnight on July 3, 2023, during the middle of his shift, Russo's co-worker informed him about some suspicious activity in PCA's parking lot wherein certain people were hovering around Russo's 2022 Ryker.

103.    Russo immediately walked out to investigate the incident only to see someone driving off with his motorcycle.

104.    At the time Russo's 2022 Ryker was stolen, however, his DESS Key was in his pocket, meaning that the thieves stole it despite not having the ostensibly unique key with which Russo's motorcycle was supposed to be equipped.

105.    Russo filed a police report and made a claim to his insurance company.

106.    Days later, on or about July 8, 2023—and pursuant to Defendants' directives in the Operator's Guide—Russo went to Cedar Creek, the authorized dealer from which he purchased the motorcycle, to inform the dealer of this problem and demand it be remedied.

107.    During Russo's visit to Cedar Creek, he also brought one of his DESS keys to the dealership to determine whether what he read online after the theft of his 2022 Ryker was true;

namely, that despite Defendants' representations about the D.E.S.S.™ technology that was supposed to be installed on his motorcycle, any Ryker key could start any other Class Bike.

108.     Russo also documented his attempt to start other Class Bikes with a video from his phone, which confirmed that any Ryker key could be used to start any other Class Bike.

109.     Russo again raised these concerns with Cedar Creek and demanded that it remedy the problem; the manager who watched Russo start a random motorcycle with his DESS key had no answers for how Russo was able to do this and stated he would investigate the matter and follow up with Russo.

110.     Notwithstanding these representations, however, neither Cedar Creek nor Defendants ever contacted Russo about this problem.

111.     Ultimately, Russo's 2022 Ryker was never recovered and thus declared a total loss.

112.     Russo's insurer remitted $10,295.00 towards the 2022 Ryker, leaving him to pay off the remaining balance of his loan.

113.     Russo was also forced to pay his insurance deductible and was also required to make an additional financing payment towards his motorcycle while his insurer processed his claim.

114.     Prior to bringing this lawsuit, and pursuant to the Operator's Guide accompanying his 2022 Ryker, Russo notified Cedar Creek of the Defect, which he requested Defendants and/or Cedar Creek to remedy.

115.     Neither Cedar Creek nor Defendants responded to Russo's request, however. Accordingly, Russo then notified Defendants through written correspondence that they were in breach of various warranties and that he intended to vindicate his rights through a class action, thus

28

satisfying the procedural requirements before filing this litigation under the Uniform Commercial Code and the MMWA.

*Harrison's Motorcycle Is Stolen From His Home*
*Weeks After He Purchased It*

116. On April 13, 2023, Harrison purchased a new, 2023 Can–Am Ryker Sport from one of Defendants' authorized dealers, Don's Cycle Kawasaki d/b/a/ Don's Cycle, located at 20 E. Market St., Hallam, PA 17406.

117. Harrison went to Don's Cycle knowing that he wanted to purchase a Ryker because he was already familiar with the Can–Am brand given the research he conducted before he decided to make his purchase.

118. Harrison visited Defendants' Can–Am website to learn more about the Can–Am Ryker Sport bike.

119. Likewise, Harrison also visited Don's Cycle's website, which provides information, photos, and specifications of the motorcycles in its inventory, including the 2023 Ryker that Harrison ultimately purchased.

120. Consistent with the above–referenced, exemplar representations, Don's Cycle's website also represented that the 2023 Ryker motorcycles in its inventory, including the motorcycle Russo ultimately purchased, came equipped with Defendants' D.E.S.S.™ technology. The dealership employee stated that the keys Harrison received were the only ones capable of starting his Class Bike.

121. At no time prior to Harrison purchasing his 2023 Ryker Sport, however, did Defendants—either directly or through Don's Cycle—inform Harrison that despite Defendants' myriad representations touting that their motorcycles were equipped with standard D.E.S.S.™

29

technology, this was in-fact untrue; specifically, these representations were materially false because any Ryker DESS key could be used to start any 2023 Ryker bike.

122. As detailed herein, Defendants and their dealers made these material misrepresentations despite their knowledge to the contrary, as evidenced by the number of reports complaining about the lack of D.E.S.S.™ technology, which poses a much greater risk that the Class Bikes can be stolen.

123. Likewise, at no time prior to Harrison buying his 2023 Ryker, did Defendants—either directly or through their dealer, Don's Cycle—inform him about (i) the safety concerns posed by the Defect; (ii) the increased likelihood that his Ryker would be stolen because of the Defect; or (iii) the fact Defendants and their dealers would disclaim any liability flowing from the Defect as a result of the theft.

124. All these facts were material to Harrison's decision to buy his 2023 Ryker; had he been aware of these facts, he would have purchased a different make of motorcycle all together.

125. Absent this knowledge, and in reliance on Defendants' contradictory representations in their marketing material and Operator's Guide, Harrison purchased his 2023 Ryker Sport (VIN: 3JB2JEG44PJ000798) for approximately $11,400.00.

126. At the time of his purchase, Don's Cycle also provided him with two, ostensibly unique DESS keys that were supposed to be uniquely programmed to his motorcycle, just as the Operator's Guide represented.

127. On information and belief, the component parts of Harrison's motorcycle comprising the Defect did not substantially change from the time the vehicle left Defendants' control

to the day Harrison bought it; nor did Harrison modify any of these component parts during his short tenure as the 2023 Ryker's owner.

128. Less than two months after purchasing the 2023 Ryker, Harrison left it at his home and traveled out-of-state for work. On or about July 7, 2023, Harrison's girlfriend called him and asked if Harrison had come to pick up the Class Bike because she observed it was missing. Harrison informed her that he had not picked up his motorcycle, and thus concluded it had been stolen.

129. After purchase, Harrison installed an AirTag to be able to track the location of his Class Bike, and after it was stolen, found that it was in Reading, Pennsylvania.

130. On or about July 8, 2023, Harrison contacted the police and reported his Class Bike stolen. The police declined to travel to Reading, PA to attempt to recover his motorcycle, however, and told Harrison that they were unable to open garages or other buildings to search for it, even if Harrison provided the location via the affixed AirTag.

131. Harrison then called Don's Cycle and asked how his Class Bike had been stolen, as Don's Cycle informed him that the keys he received at the time of purchase were the only keys capable of starting the Class Bike. The dealership employee informed Harrison that they were aware of recent thefts of the Class Bikes, and also conceded that Don's Cycle itself had recently experienced thefts of its own inventory of Class Bikes.

132. Harrison also submitted an insurance claim, which only reimbursed him for the $11,400 purchase price of the Class Bike, for which Harrison paid a $1,000 deductible. It did not reimburse him for the approximately $2,000 in aftermarket parts and taxes he had paid.

133. Prior to bringing this lawsuit, and pursuant to the Operator's Guide accompanying his 2023 Ryker, Harrison notified Don's Cycle of the Defect, which he requested Defendants remedy.

134. Neither Defendant responded to Harrison's request, however. Accordingly, Harrison then notified Defendants through written correspondence that they were in breach of various warranties and that he intended to vindicate his rights through a class action, thus satisfying the procedural requirements before filing this litigation under the Uniform Commercial Code and the MMWA.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

135. Plaintiffs and the Class had no way of knowing about the Defect in their respective Class Bikes because Defendants concealed it.

136. Within the applicable period of limitations, certain Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence that Defendants were concealing the existence and nature of the Defect.

137. Even in the event of preceding occurrences of theft—whether scattered here or clustered elsewhere throughout the country—an ordinary consumer, without sophisticated knowledge of mechanical systems and antitheft devices, would not and could not suspect that his or her motorcycle that was stolen was, in fact, attributable to a pervasive Defect because Defendants withheld this information.

138. All applicable statute of limitations have therefore been tolled by operation of the discovery rule.

*Fraudulent Concealment Tolling*

139.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active campaign to fraudulently conceal the existence and nature of the Defect through the period relevant to this action.

140.    Instead of disclosing the Defect in the Class Bikes, Defendants continued to falsely represent that their motorcycles were equipped with Defendants' proprietary D.E.S.S.™ technology; a security measure expressly designed to protect the Class Bikes from theft and keep their drivers safe.

141.    As the Defect is not readily observable and the average consumer is not technically savvy enough to understand, in isolation, why his or her motorcycle may have been stolen, the increasing number of thefts of Defendants' Class Bikes was not fully appreciated by anyone except Defendants; that is, the only parties armed with the most data about this growing threat.

142.    Because Defendants were and remain under a constant, unflagging obligation to disclose to Plaintiffs and the Class the true character, quality, and nature of the Defect in the Class Bikes, Defendants' active concealment of this fact tolls any applicable statute of limitations.

*Estoppel*

143.    The doctrine of equitable estoppel operates to bar a defendant guilty of fraudulent or inequitable conduct from asserting a given limitations period as a defense.

144.    As noted above, Defendants were and remain under a constant, unflagging obligation to disclose to Plaintiffs and the Class the true character, quality, and nature of the Defect in the Class Bikes.

145. Thus, Defendants' failure to adhere to this mandate amounts to an affirmative misrepresentation that—contrary to the true state of affairs—the Class Bikes were safe, reliable, and equipped with their proprietary D.E.S.S.™ technology, just as Defendants advertised.

146. As a result, certain members of the Class may have failed to commence an action within the statutory period relying on Defendants' fraudulent and/or inequitable conduct as noted above.

147. This action is being brought on behalf of members of the Class who were affected by Defendants' misconduct and there has been no unreasonable delay in pursuing it.

CLASS ACTION ALLEGATIONS

148. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4), and 23(c)(5) of the Federal Rules of Civil Procedure (the "Rule 23") on behalf of themselves and the members of the following proposed Class and Subclasses as defined below:

- **The Class:** All persons in the United States who currently own a Class Bike or formerly owned a Class Bike.
- **The Wisconsin Subclass:** All persons in Wisconsin who currently own a Class Bike or formerly owned a Class Bike that was purchased in Wisconsin.
- **The Pennsylvania Subclass:** All persons in Pennsylvania who currently own a Class Bike or formerly owned a Class Bike that was purchased in Pennsylvania.

149. The following parties, however, are specifically excluded from the foregoing definitions of the Class and Subclasses (hereafter, the "Class" unless otherwise noted): Defendants; any of Defendants' parent companies, subsidiaries, affiliates, dealers, successors, assigns, officers, directors, legal representatives, employees, agents, family members, and/or co-conspirators; all persons or entities that purchased the Class Bikes for resale; all governmental entities, as well as the judges, judicial officers, and associated court staff assigned to or working on this case, including the immediate family members of those judges, judicial officers, and associated court staff.

34

150. Subject to additional information that will be obtained through further investigation and discovery, Plaintiffs reserve the right to amend, redefine, and/or modify the foregoing definitions of the Class and Subclasses as needed to do substantial justice.

151. **Numerosity**: Members of the Class are so numerous that joinder of all members is impracticable pursuant to Rule 23(a)(1). The Class is composed of thousands of members dispersed throughout the state of Wisconsin, located in any county where Defendants' vehicles are sold. Although Plaintiffs do not know the exact number of Class members, which can only be ascertained through appropriate discovery, the Class is readily identifiable from information and records in Defendants' possession, custody, and control.

152. **Commonality**: There are questions of law or fact common to the Class pursuant to Rule 23(a)(2). Such legal or factual questions include but are not limited to:

  i. Whether Defendants designed, advertised, sold, and placed the Class Bikes into the stream of commerce.

  ii. Whether the Class Bikes were designed and sold with the Defect described above.

  iii. Whether the Defect rendered the Class Bikes unreasonably dangerous to Plaintiffs and the Class.

  iv. When and to what extent Defendants learned of the Defect in the Class Bikes that makes them easy to steal.

  v. The determination that Defendants made concerning why the Class Bikes were designed with the Defect versus other vehicle models in Defendants' product line.

  vi. Whether Plaintiffs and the Class experienced out-of-pocket losses as a result of the Defect and, if so, how much.

  vii. Whether Defendants violated the consumer protection laws of Wisconsin, and Pennsylvania in connection with its advertisement and marketing campaign of the Class Bikes.

  viii. Whether Defendants breached their express warranties for their respective Class Bikes.

ix.    Whether Defendants breached their implied warranty of merchantability tied to their respective Class Bikes.

x.    Whether Defendants violated the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*, as a result of any breach of their express and/or implied warranties.

xi.    Whether Defendants' remedy limitations in their express warranties fail their essential purpose.

xii.    Whether Defendants' warranties are unconscionable, in whole or in part, for disclaiming foreseeable liability and otherwise recoverable harm as a result of the Defect.

xiii.    Whether Defendants were unjustly enriched by Plaintiffs and the Class.

xiv.    Whether Plaintiffs and the Class are entitled to damages and/or other monetary relief and, if so, in what amount or form should it take.

153.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class pursuant to Rule 23(a)(3) because all Class members are similarly affected by Defendants' conduct: indeed, Plaintiffs and the Class: (i) purchased or leased Class Bikes manufactured and designed by Defendants that contain the Defect; (ii) have, are, or will suffer the same or similar monetary harm caused by the uptick in auto thefts as a result of the Defect in the Class Bikes; and (iii) were furnished the same or substantially similar advertisements that were created by Defendants, and which misrepresent that the Class Bikes were equipped with Defendants' proprietary D.E.S.S.™ technology.

154.    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class pursuant to Rule 23(a)(4) because: (i) neither Plaintiffs nor their counsel have interests that conflict with the interest of the Class they represent; (ii) Plaintiffs are willing and able to vigorously litigate this action on behalf of the Class who, along with their counsel, have adequate resources to do so; and (iii) Plaintiffs' proposed class counsel has the qualifications, experience, and capabilities to handle the case as a class action.

155.    Pursuant to Rule 23(b)(1), litigating this matter as a class action, as opposed to separate actions brought by individual Class members, alleviates the risk of: (i) inconsistent or

36

varying adjudications that would establish incompatible standards of conduct for Defendants; and/or (ii) adjudications of individual Class members' actions that may, as a practical matter, be dispositive of the interests of other Class members not parties to the individual adjudications, or substantially impair or impede their ability to protect their interests.

156. Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds that apply to the Class, thus rendering final injunctive relief, equitable relief, and/or a corresponding declaratory judgment with respect to the Class as a whole appropriate.

157. Pursuant to Rule 23(b)(3), the questions of law or fact common to the Class predominate over any questions affecting only individual Class members; thus, a class action is superior to other available methods of fairly and efficiently adjudicating this controversy.

158. Treatment of this controversy as a class action is therefore a superior means of effectuating its fair and efficient adjudication. Such treatment will permit a large number of similarly situated Class members to litigate their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Rule 23 provides the Court with authority and flexibility to maximize the benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, utilize the processes of Rule 23(c)(4) and/or (c)(5) to certify common questions of fact or law and to designate subclasses.

159. Additionally, the amount of monetary damages at issue for each claim is such that the expenses of litigating Plaintiffs' and each Class member's claims individually would be cost

prohibitive, such that proceeding individually would deny Plaintiffs and the Class members a viable remedy. Proceeding by way of class action is therefore the only fair, efficient, economical, and sensible way to vindicate the injuries that Plaintiffs and the Class members have sustained.

160. Plaintiffs know of no difficulty, nor can they foresee any difficulty, that they may have in maintaining this class action that would preclude its maintenance as such.

161. The undersigned counsel for Plaintiffs and the Class request that this Court appoint them to serve as Class counsel, first on an interim basis and then on a permanent basis, pursuant to Rule 23(g), as the undersigned counsel has: (i) done substantial work in identifying and investigating the claims brought in this action; (ii) experience handling complex litigation and the types of claims asserted in this action; (iii) knowledge of the applicable law; and (iv) sufficient resources to commit to the representation of the Class. Moreover, the undersigned counsel will fairly and adequately represent the interests of the Class. *See* Fed. R. Civ. P. 23(g)(1)(A) & (B).

## COUNT I: BREACH OF EXPRESS WARRANTY
### (Against Defendants)

162. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

163. Plaintiffs bring this claim on behalf of themselves and the Class, or in the alternative, on behalf of the Wisconsin and Pennsylvania Subclasses.

164. Defendants designed, developed, manufactured, distributed, and sold the Class Bikes into the stream of commerce with the intent that consumers like Plaintiffs and members of the Class would purchase them as a means of transportation.

165. Defendants made express warranties to the ultimate purchasers and lessees of the Class Bikes, including Plaintiffs and members of the Class.

166. Defendants—in various marketing materials, including their user manuals, advertisements on their own website, and in marketing literature on their dealers' websites—made affirmations of fact and other promises in connection with the sale of the Class Bikes, which were woven into the fabric of the parties' agreement, therefore becoming part of the basis of the parties' bargain.

167. Applied here, Defendants repeatedly and consistently represented that the Class Bikes were equipped with Defendants' proprietary D.E.S.S.™ technology, which was expressly designed to curb motorcycle thefts.

168. These are actionable, express warranties about the safety and design of Plaintiffs' Class Bikes.

169. Plaintiffs and the Class relied on these express warranties in connection with purchasing their respective Class Bikes.

170. But Defendants breached these express warranties by selling Class Bikes to Plaintiffs and the Class that Defendants knew contained safety defects in their antitheft systems.

171. Defendants' attempt to disclaim or otherwise limit both their liability under these express warranties and/or any remedies flowing therefrom vis-à-vis these consumers is unenforceable and unconscionable under the circumstances presented.

172. *First*, U.C.C. § 2-316 negates any disclaimer and/or modification of an express warranty in the face of inconsistent language that created the warranty in the first instance.

173. *Second*, Defendants' attempt to disclaim responsibility for the Defect and any damages flowing from the resultant theft of the Class Bikes is void and unenforceable for the following reasons: (i) Defendants knowingly sold the Class Bikes with a latent Defect that violates

39

their own marketing literature and express warranties; (ii) despite their knowledge of this Defect, and the ever increasing risk this presented, Defendants continued to sell the Class Bikes without ever informing Plaintiffs or the Class; and (iii) Defendants cannot disclaim responsibility for a design defect that otherwise breaches the implied warranty of merchantability when the MMWA prohibits the disclaimer of these implied warranties.

174.    Indeed, the MMWA prohibits a warrantor's ability to disclaim implied warranties, which can only be limited to the duration of an express warranty. As detailed herein, sufficient privity exists in this case to support implied warranty claims asserted by Plaintiffs and the Class.

175.    The time limitations on Defendants' warranty are also unconscionable and inadequate to protect certain members of the Class.

176.    Specifically, the manner in which Defendants distribute their vehicles presents a variety of procedural and unconscionable elements whereby: (i) Defendants offered the express warranties contained within their user manuals on a "take-it-or-leave-it" basis; (ii) Plaintiffs and the Class lacked a meaningful opportunity to negotiate or modify the terms of these warranties; (iii) a gross disparity of bargaining power existed between Defendants and the Class members; and (iv) Defendants knew or should have known that the Class Bikes contained the Defect at the time they were sold, all while misrepresenting these vehicles as safe and secure. Accordingly, the warranties' limitations and exclusions therefore fail and are unenforceable pursuant to U.C.C. § 2-302(1).

177.    As a direct and proximate result of the breach of these express warranties, Plaintiffs and the Class have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial, including but not limited to overpaying for the Class Bikes, insurance deductibles, the cost to replace other property stolen in connection with the thefts of their Class

Bikes, the loss of use of their respective motorcycles, costs associated with the replacement of the totaled Class Bikes and/or the diminution in value of a stolen Class Bikes that were not totaled.

178.    Pursuant to U.C.C. § 2-719(2), the circumstances described herein caused Defendants' exclusive or limited remedies to fail their essential purpose, such that Plaintiffs and the Class may seek remedies as provided in the Uniform Commercial Code. Indeed, these warranties have denied Plaintiffs and the Class the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Bikes in a meaningful manner without the ever-present risk of them being stolen.

179.    Further, Defendants' exclusion and/or limitation of consequential damages in their written warranties is unconscionable and void for the reasons stated above.

180.    Accordingly, Plaintiffs and the Class are entitled to damages flowing from Defendants' breach of their express warranties, as well as all consequential and incidental damages resulting from this breach.

181.    Prior to joining this lawsuit, Plaintiffs each notified Defendants of the defective nature of the Class Bikes and of Defendants' breach of their express warranty within a reasonable time following the discovery of the Defect.

### COUNT II: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Defendants)

182.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

183.    Plaintiffs bring this claim on behalf of themselves and the Class, or in the alternative, on behalf of the Wisconsin and Pennsylvania Subclasses.

41

184. As detailed herein, Defendants designed, manufactured, distributed, and sold the Class Bikes knowing that consumers such as Plaintiffs would purchase these products from Defendants' authorized dealers as a means of transportation.

185. As merchants of the Class Bikes, Defendants warranted to Plaintiffs that the Class Bikes were fit for the ordinary purpose for which they are used. *See* U.C.C. 2–314(2)(c). In other words, Defendants impliedly warranted that the Class Bikes would provide safe, reliable transportation.

186. Plaintiffs relied on this warranty to their detriment.

187. Indeed, the Class Bikes are not "merchantable" because they are not reasonably fit for the ordinary purpose for which they are sold, which is to provide *safe, reliable* transportation. Instead, the Class Bikes pose a safety hazard as the Defect renders them prone to being stolen, which makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

188. Apart from the safety issues posed by the Class Bikes, the ease with which they can be stolen renders them unreliable.

189. Sufficient privity of contract exists to assert this implied warranty claim.

190. In Wisconsin, for example, the MVDL's implementing regulations make clear that— in connection with the sale of new Can-Am motorcycles—Defendants cannot exclude any implied warranties that must accompany the sale of a new vehicle in Wisconsin. *See* Wis. Admin. Code TRANS § 139.06 ("No implied warranty of merchantability or fitness shall be excluded in the sale of a motor vehicle unless the sale is explicitly negotiated between the purchaser and dealer licensee on an "AS IS—NO WARRANTY" basis and is in conformity with s. Trans 139.04(6)(a)5 [concerning

used vehicle sales]. No implied warranty of merchantability or fitness shall be modified or limited, except that implied warranties may be limited to the duration of a written limited warranty of reasonable duration.") (emphasis added).

191. The MVDL's implementing regulations thus emulate the Magnuson–Moss Warranty Act ("MMWA"), which holds that suppliers of written warranties on consumer products cannot disclaim or modify any implied warranty on a consumer product but can limit the duration of any implied warranties to the duration of the express warranty accompanying the product. *See* 15 U.S.C. § 2308.

192. Regardless, even in states that have not abrogated the common law privity requirement, Class members in those states are still third-party beneficiaries of the warranties furnished with each Class Bike, which satisfies this privity requirement.

193. Defendants market and advertise the sale of their vehicles, including the Class Bikes, in various media outlets across the United States, including to Plaintiffs and the Class.

194. A given consumer can go to Defendants' website, obtain information about a vehicle in which he or she is interested; design a specific vehicle to meet his or her needs; obtain information about the value of his or her trade–in; request additional marketing materials; and obtain a quote for a vehicle in which he or she is interested. Defendants provide this information, acting as a putative seller, and then send these consumers to one or more "authorized dealers" to assist in consummating a sale.

195. On information and belief, Defendants—in furtherance of their relationship with their respective dealers—each control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective

trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Bikes.

196. What is more, Defendants advertise their authorized dealer network on their respective websites and task them with administering the promotional material and warranty information for new Class Bikes to prospective consumers throughout the state.

197. Relevant here, Plaintiffs each purchased their respective Class Bikes from the Defendants "authorized dealers," with the understanding that these dealers were acting on behalf of Defendants.

198. The sole and express purpose that each authorized Defendant dealer has when it acquires the vehicles from Defendants is to immediately re-sell them to the end-users.

199. Defendants and their dealers' actions thus create a justifiable belief on the part of Plaintiffs that the dealers from which they purchased their respective Class Bikes were Defendants' agents, which Plaintiffs relied on to their detriment.

200. Consequently, each of Defendants dealerships—although incorporated and/or organized as a distinct entity—operates as the actual and/or apparent agent of the Defendants named herein, which satisfies the privity requirement.

201. As described above, the purchase agreements between Plaintiffs and their respective dealers were entered directly and primarily for Defendants' benefit.

202. Likewise, any contract whereby Defendants' authorized dealers acquire the Class Bikes from Defendants to resell to the end-user is also for the express benefit of Plaintiffs and the Class.

203. Plaintiffs therefore have standing to assert implied warranty claims against Defendants by virtue of their status as intended, third-party beneficiaries of these dealership sales agreements, which further satisfies the privity requirement. *See, e.g., Sanchez–Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1234 (S.D. Fla. 2014) ("Literal privity can be finessed by a proxy: direct beneficiary or third-party beneficiary status.") (quoting *In re Masonite Corp. Hardboard Siding*, 21 F. Supp. 2d 593, 599 (E.D. La. 1998) (collecting cases).

204. Additionally, the Magnuson–Moss Warranty Act ("MMWA") specifies that when a manufacturer offers a written warranty, it may limit the duration of an implied warranty to the duration of an express warranty, *but it cannot* disclaim implied warranties all together. *See* 15 U.S.C. § 2308(a) ("No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer Product. . . .").

205. If the MMWA prohibits a manufacturer that offers an express warranty from disclaiming implied warranties, it follows that a manufacturer cannot avoid this prohibition by offering an express warranty that disclaims coverage that would otherwise fall within the ambit of an implied warranty it cannot disclaim simply by selecting a distribution model that allows it to skirt implied warranties by claiming an ostensible lack of privity.

206. The Operator's Guides that Defendants' dealers provided to Plaintiffs and members of the Class furnished the underlying consideration to Defendants for their express warranties;

45

privity thus exists between Defendants on the one hand, and Plaintiffs and the Class on the other by virtue of the express warranties provided through these purchase agreements.

207.    Moreover, imposing a rigid privity requirement in this case would permit Defendants to escape both the letter and spirit of the MMWA through their preferred distribution scheme; one in which the only parties in strict privity that can assert an implied warranty claim are the Defendants' dealers who would never need to assert the claim in the first instance.

208.    As a direct and proximate result of the breach of these express warranties, Plaintiffs and the Class have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial, including but not limited to overpaying for the Class Bikes, insurance deductibles to get the stolen Class Bikes repaired, the cost to replace other property stolen in connection with the thefts of their Class Bikes, the loss of use of their respective motorcycles, costs associated with the replacement of the totaled Class Bikes and/or the diminution in value of the stolen Class Bikes that were totaled.

209.    Pursuant to U.C.C. § 2–719(2), the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose, such that Plaintiffs and the Class may seek remedies as provided in the Uniform Commercial Code. Indeed, these warranties have denied Plaintiffs and the Class the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Bikes in a meaningful manner without the ever–present risk of them being stolen.

210.    Further, Defendants' exclusion and/or limitation of consequential damages in their warranties is unconscionable and void for the reasons stated above.

46

211. Accordingly, Plaintiffs and the Class are entitled to damages flowing from Defendants' breach of their implied warranties, as well as all consequential and incidental damages resulting from this breach.

212. Prior to joining this lawsuit, Plaintiffs notified Defendants of the defective nature of the Class Bikes and of Defendants' breach of the implied warranty of merchantability within a reasonable time following the discovery of the Defect.

## COUNT III: VIOLATION OF MAGNUSON MOSS WARRANTY ACT, 15 U.S.C. §§ 2301 *ET SEQ.* (Against Defendants)

213. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

214. Plaintiffs bring this claim on behalf of themselves and the Class, or in the alternative, on behalf of the Wisconsin and Pennsylvania Subclasses.

215. In 1975, Congress enacted the MMWA, 15 U.S.C. §§ 2301 *et seq.*, to address the widespread misuse of merchants' express warranties and to protect consumers from deceptive warranty practices. To that end, the MMWA imposes civil liability on any "warrantor" for failing to comply with any obligation under a written or corresponding implied warranty. *Id.* § 2310(d)(1).

216. The Class Bikes are "consumer products" as defined in 15 U.S.C. § 2301(1).

217. Plaintiffs and the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

218. Defendants are "suppliers" and "warrantors" as those terms are defined in 15 U.S.C. § 2301(4) & (5), respectively.

219. In connection with the sale and/or lease of the Class Bikes, Defendants supplied Plaintiffs and the Class with "written warranties" as that term is defined in 15 U.S.C. § 2301(6).

220. 15 U.S.C. § 2310(d)(1) provides that "a consumer who is damaged by the failure of the supplier, warrantor, or service contractor to comply with any obligation under [the MMWA], or

47

a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state."

221. As detailed above, Defendants repeatedly and consistently represented that the Class Bikes were equipped with Defendants' proprietary D.E.S.S.™ technology, which was expressly designed to curb motorcycle thefts.

222. But Defendants breached these express warranties because the Defect at issue was present in the Class Bikes at the time of sale, Defendants knew that the Class Bikes were not equipped with this type of immobilizer technology despite Defendants' representations, and Defendants did not disclose or repair the Defect prior to each sale of the Class Bikes.

223. Further, as detailed herein, the additional disclaimers and/or limitations incorporated into Defendants' warranties—including but not limited to the warranties' durational limits and limitations on incidental and consequential damages—are unconscionable as a matter of law.

224. Indeed, at the time Defendants issued written warranties for the Class Bikes, they knew and had notice that these motorcycles contained the Defect, which directly contradicted the myriad representations they made regarding the Class Bikes coming equipped with Defendants' proprietary D.E.S.S.™ technology. Their continued misrepresentations and omissions regarding the Class Bikes, as well as their failure to abide by their own written and implied warranties, are "[u]nfair methods of competition in or affecting commerce, and [are] unfair or deceptive acts or practices in or affecting commerce." Accordingly, Defendants' behavior also is unlawful under 15 U.S.C. §§ 2310(b), 45(a)(1).

225. Plaintiffs used their respective Class Bikes in a manner consistent with their intended use and performed every duty required of them under the terms of the warranty, except as may have been excused or prevented by Defendants' conduct or by operation of law in light of their unconscionable conduct as described herein.

226. Plaintiffs and the Class seek to recover damages resulting directly from Defendants' breach of their written and implied warranties, as well as their deceitful and unlawful conduct, including but not limited to overpaying for the Class Bikes, insurance deductibles to get the stolen Class Bikes repaired, the cost to replace other property stolen in connection with the thefts of their Class Bikes, the loss of use of their respective motorcycles, costs associated with the replacement of the totaled Class Bikes and/or the diminution in value of a stolen Class Bike that was not totaled.

227. The MMWA also permits "other legal and equitable" relief. 15 U.S.C. § 2310(d)(1). Accordingly, Plaintiffs seek reformation of Defendants' respective written warranties to comport with their obligations under the MMWA and with consumers' reasonable expectations. Further, Plaintiffs seek to enjoin Defendants from acting unlawfully as further alleged, including discouraging them and other consumers to seek all available remedies.

228. Finally, the MMWA also provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in the Court's discretion. 15 U.S.C. § 2310(d)(2). Plaintiffs intend to seek such an award as prevailing consumers at the conclusion of this case.

229. Prior to joining this action, Plaintiffs satisfied all jurisdictional prerequisites to bring this MMWA class action.

### COUNT IV: STATUTORY FRAUD IN VIOLATION OF WIS. STAT. §§ 895.446 & 943.20(1)(d)
### (Against All Defendants)

230. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

231. Russo brings this claim on behalf of himself and on behalf of the Wisconsin Subclass.

232. It is axiomatic that as manufacturers, importers, and/or distributors of their motorcycles, Defendants—both individually and/or through one or more Fictitious Defendants—have a duty to design and sell reasonably safe products.

233. Part and parcel of this obligation is the duty to provide consumers with sufficient information about the safety of these motorcycles, so that they can make an informed purchasing decision.

234. Indeed, the MVDL prohibits any "licensee," which includes Defendants, from engaging in various forms of misconduct, including: (i) willfully defrauding any retail buyer or lessee; (ii) engaging in fraudulent sales, consumer leases, or any other transaction; and (iii) making any "fraudulent misrepresentation, circumvention or concealment through whatsoever subterfuge or device of the material particulars" related to the retail purchase or lease of their vehicles. *See* Wis. Stat. §§ 218.0116(c), (dm), (e).

235. A seller's obligation to inform a consumer about material issues related to his or her contemplated purchase of a product is also deeply rooted in the law. The Wisconsin Supreme Court has held that a duty to disclose arises when: (i) the fact is material to the transaction; (ii) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (iii) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (iv) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 20, 283 Wis.2d 555, 699 N.W.2d 205.

236. The Restatement of Torts, on which Wisconsin courts repeatedly turn for guidance, has also embraced a seller's duty to disclose in the following situations:

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts, § 551.

237. Thus, when a duty to disclose arises, a seller's failure to disclose (or to make full disclosure) is also actionable.

238. Applied here, Defendants—through a variety of marketing campaigns disseminated in various media—consistently represented that the Class Bikes were equipped with their proprietary D.E.S.S.™ technology as a standard anti-theft feature.

239. Given the duties noted above, it follows that each time a new or used Class Bike was sold, Defendants were representing to prospective customers—both directly and indirectly—that these motorcycles were secure.

240. Indeed, Russo and members of the Wisconsin Subclass purchased their respective Class Bikes believing they were equipped with standard anti-theft measures and none of them would have purchased a Class Bike had they known it could be started and then stolen with something as simple as a magnet.

51

241.    In other words, the ease with which the Class Bikes can be stolen—including the motorcycle that Russo bought—was a fact "basic to the transaction" that Defendants were obligated to disclose.

242.    As detailed herein, at the time Defendants made these representations to Russo and each member of the Wisconsin Subclass, Defendants knew they were false or they made them recklessly, without caring whether they were true or false.

243.    Defendants made these representations—both directly and indirectly—to deceive and defraud Russo and the Wisconsin Subclass.

244.    Further, Russo and members of the Wisconsin Subclass were misled by Defendants' misrepresentations, especially when juxtaposed against Defendants' marketing materials to the contrary, which touted their D.E.S.S.™ technology as a standard anti-theft feature.

245.    Russo and members of the Wisconsin Subclass relied on these misrepresentations to their detriment, mistakenly believing—as a direct result of Defendants' fraudulent conduct—that their respective motorcycles were outfitted with Defendants' D.E.S.S.™ technology to prevent easy thefts of the Class Bikes.

246.    As a result of this fraudulent scheme, Russo and the Wisconsin Subclass paid money for their respective Class Bikes, which ultimately redounded to Defendants' pecuniary benefit.

247.    As a result, Defendants conspired to violate Wis. Stat. § 943.20, which vests Russo and the members of the Wisconsin Subclass with a claim under Wis. Stat. § 895.446 because they "suffered damage or loss by reason of this intentional conduct."

248.    Russo and the Wisconsin Subclass have been damaged as a result of this fraudulent scheme in an amount to be determined at trial. Specifically, they have suffered significant damages

including but not limited to overpaying for the Class Bikes, insurance deductibles and premiums once their Class Bikes are stolen, the cost to replace other property stolen in connection with the thefts of their motorcycles, the loss of use of their respective motorcycles, costs associated with the replacement of totaled Class Bikes and/or the diminution in value of a stolen Class Bike that was not totaled.

249. In accordance with Wis. Stat. § 895.446, Russo and the Wisconsin Subclass also seek exemplary damages, attorneys' fees, and all costs of the investigation and litigation that were reasonably incurred as a result of Defendants' misconduct.

### COUNT V: STATUTORY VIOLATION OF WIS. STAT. § 100.18
### (Against All Defendants)

250. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

251. Plaintiffs bring this claim on behalf of themselves and the Class, or in the alternative, on behalf of the Wisconsin and Pennsylvania Subclasses. *Cf. State v. Talyansky*, 2023 WI App 42, ¶¶ 36-37, 409 Wis. 2d 57, 995 N.W.2d 277, *review denied sub nom. State v. Engine & Transmission World, LLC*, 2024 WI 12, 6 N.W.3d 883 (noting that applying Wis. Stat. § 100.18 to out-of-state consumers posed no constitutional problem when the advertisements were made by in-state defendants who were already subject to Wisconsin's False Advertising Statute).

252. Section 100.18 of the Wisconsin Statutes ("Section 100.18") prohibits a company from making false, deceptive, or misleading advertisements to the public, which the intent to sell or distribute the company's products. The statute states in pertinent part that:

> [N]o person, firm, corporation or association, . . . with intent to sell, distribute, increase the consumption of or in any wise dispose of any . . . merchandise . . . or anything offered by such person, firm, corporation or association, . . . directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to

53

the purchase, sale, hire, use or lease of any . . . merchandise, . . . shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, . . . an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such . . . merchandise, . . . or to the terms or conditions thereof, which . . . contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1).

253.    In promoting the Class Bikes to the public, Defendants engaged in a multi-faceted advertising campaign, providing virtually identical information—through their website, Ownership Manuals, dealers' websites, and other marketing materials, amongst others—to the Plaintiffs and to consumers nationwide, including members of the Class, through which Defendants touted that their motorcycles were equipped with their propriety D.E.S.S.™ technology that was designed to prevent the theft of the Class Bikes.

254.    On information and belief, Defendants created and developed advertising and marketing materials, including, but not limited to, their website content, design, information, and representations; dealers' website content, design, information, and representations; Operator's Manuals; and other advertising materials, marketing materials, and representations.

255.    On information and believe, Defendants, in the state of Wisconsin, directly and through their agents and servants in Wisconsin, including their dealers and BRP US, made, published, disseminated, circulated and placed those advertising and marketing materials and representations before the public and also caused those advertising and marketing materials to be made, published, disseminated, circulated, and placed before the public.

54

256.   Defendants' consumer-facing website is viewable with a click of a button to any prospective purchaser; consumers who are then directed by Defendants to a specific authorized dealer to buy the Can-Am motorcycle of their choice.

257.   As detailed above, pursuant to this marketing campaign, prospective consumers are led to believe that Defendants outfitted the Class Bikes with Defendants' D.E.S.S.™ technology that was designed to prevent the theft of the Class Bikes.

258.   On information and belief, however, notwithstanding these representations, Defendants failed to equip the Class Bikes with an immobilizer by making their D.E.S.S.™ technology a standard feature.

259.   When these facts are juxtaposed against the exemplar advertisements above, Defendants' advertising and marketing materials and representations touting their D.E.S.S.™ technology as being ostensibly equipped as a standard feature on the Class Bikes are categorically and measurably false.

260.   What is more, on information and belief, Defendants had actual and/or constructive knowledge about their failure to implement D.E.S.S.™ technology on the Class Bikes despite their representations to the contrary.

261.   Accordingly, the Plaintiffs and members of the Class have been exposed to Defendants' ongoing, deceptive advertising campaign and thus suffered pecuniary damage and monetary loss redressable under Section 100.18.

262.   Neither the Plaintiffs nor other members of the Class would have consummated the sale of a Class Bike had Defendants explained the truth; specifically, that despite these marketing

materials touting the Class Bikes' D.E.S.S.™ technology, they contained a Defect that subjected these consumers to an ever-present risk of motorcycle theft.

263.    As such, Defendants conspired to violate Section 100.18 by disseminating to the public—including the Plaintiffs and members of the Class—false, deceptive, and misleading advertising materials about the Class Bikes' D.E.S.S.™ technology.

264.    Accordingly, the Plaintiffs and the Class—as members of the public to whom these false, deceptive, and misleading advertisements were directed from Wisconsin—have suffered pecuniary monetary damages that are recoverable under Section 100.18(1) in an amount to be determined at trial.

### COUNT VI: DECEPTIVE TRADE PRACTICE IN A DIRECT MARKETING SCHEME IN VIOLATION OF WIS. STAT. § 100.20 & WIS. ADMIN. CODE ATCP §§ 127.01 *ET SEQ.* (Against Defendants)[18]

265.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

266.    Russo brings this claim on behalf of himself and on behalf of the Wisconsin Subclass.

267.    Section 100.20 of the Wisconsin Statutes ("Section 100.20") prohibits individuals and entities from engaging in unfair trade practices in Wisconsin. Wis. Stat. § 100.20(1).

268.    To that end, Section 100.20 authorizes the Wisconsin Department of Agriculture, Trade and Consumer Protection ("DATCP") to "issue general orders forbidding methods of competition in business or trade practices in business which are determined by the [DATCP] to be unfair." *Id.* § 100.20(2)(a).

---

[18] Pursuant to the Court's June 13, 2024 Decision and Order, (*see* Dkt. # 20), this claim was dismissed. Because the Amended Complaint supersedes the Original Complaint and becomes the operative pleading in the case, this claim is reasserted here solely for purposes of preserving any challenge on appeal to its prior dismissal.

56

269.     The statute vests any person who suffers pecuniary loss stemming from a violation of "any order issued under [Section 100.20]" with a cause of action to sue for damages in a court of competent jurisdiction. *Id.* § 100.20(5).

270.     Relevant here, Chapter ATCP 127 of Wisconsin's Administrative Code ("ATCP 127") specifies the conduct to which a "seller" of "consumer goods and services" must adhere when making face-to-face solicitations with customers. *See* Wis. Admin. Code ATCP §§ 127.01 *et seq.*

271.     ATCP 127 defines "seller" expansively; the term encompasses Defendants because they are engaged in the business of selling, offering to sell, and/or promoting the sale of consumer goods or services to consumers. *Id.* § 127.01(21).

272.     Defendants promote the sale of the Class Bikes by disseminating advertising materials to their authorized dealers throughout the United States, including those dealers located in the state of Wisconsin.

273.     The Consumer Plaintiffs are "consumer[s]" as the term is defined in ATCP 127 because they are individuals to whom Defendants advertised, offered to sell, sold, and/or promoted the sale of consumer goods or services. *Id.* § 127.01(2).

274.     Likewise, the Class Bikes that Defendants promoted to Russo and other members of the Wisconsin Subclass fall within the ambit of "consumer goods and services," because they are goods used for personal, family, or household purposes. *Id.* § 127.01(3).

275.     ATCP 127 was adopted under the authority of Section 100.20(2) and is enforceable through a private right of action pursuant to Section 100.20(5). Thus, Russo may enforce the mandates of ATCP 127 by way of a Section 100.20(5) claim on behalf of himself and members of the Wisconsin Subclass.

276.    As "sellers" of the Class Bikes, Defendants were required to "disclose" to Russo the following information, in writing, before he entered into a purchase contract[19] for his Class Bike: "all material terms and conditions affecting the sale, receipt, or use of the consumer goods or services, including credit terms if any." *Id.* § 127.64(1)(c).

277.    The definition of "disclose" is a term of art under ATCP 127, which obligates Defendants "to make a clear and conspicuous statement which is reasonably designed to be noticed and readily understood by the consumer." *Id.* § 127.01(10).

278.    Similarly, ATCP 127 prohibits Defendants from engaging in the following misconduct when making a "face-to-face solicitation" (discussed *infra*): (i) failing to disclose material costs payable by the consumer; (ii) misrepresenting the nature, quantity, material characteristics, performance, or efficacy of the goods or services offered or promoted; (iii) failing to disclose material restrictions, limitations, or conditions on the purchase, receipt, use, or return of goods of services offered or promoted; (iv) misrepresenting the material terms of their warranty policies; and (v) making any false, deceptive, or misleading representations to consumers. *Id.* §§ 127.72(4)-(7), (15).

279.    ATCP 127 defines a "face-to-face solicitation" as a solicitation that "a seller makes in a face-to-face encounter with a consumer," including "[p]urchase contracts and other dealings that result from a face-to-face solicitation." *Id.* § 127.60.

280.    A "solicitation" is then defined more broadly as "a communication received by a consumer at a place other than the seller's regular place of business, in which a seller offers or

---

[19] ATCP 127 defines "purchase contract" as "an agreement to purchase consumer goods or services, regardless of whether that agreement is subject to a later right of cancellation. Wis. Admin. Code ATCP § 127.01(18). Because ATCP 127 defines a "purchase" as the act of buying or leasing consumer goods or services, the administrative scheme applies to members of the Class who either bought or leased a Class Vehicle. *See id.* § 127.01(17).

promotes the sale of consumer goods or services to a consumer, or which is part of a seller's plan or scheme to sell consumer goods or services to a consumer." *Id.* § 127.01(22).

281. Applied here, Defendants make face-to-face solicitations anytime a consumer buys or leases a Class Bike at one of Wisconsin's authorized dealership because there is a face-to-face encounter that takes place outside of Defendants' respective places of business, whereby Defendants, as sellers, promote the sale or lease of Class Bikes through the brochures and/or other advertising materials their authorized dealers provide the consumer on Defendants' behalf.

282. Applied here, Defendants disseminated brochures and/or other advertising materials promoting the sale or lease of Class Bikes to their authorized dealers across the United States, including those located in the state of Wisconsin.

283. As explained above, these dealers then distributed Defendants' brochures and/or other advertising materials to Russo and members of the Wisconsin Subclass at the dealerships in connection with purchasing a Class Bike.

284. As explained above, the Class Bikes contain the Defect, rendering them easy to steal and therefore highly susceptible to theft.

285. Before Russo and members of the Wisconsin Subclass entered their respective purchase contracts, however, Defendants failed to conspicuously disclose in writing all material terms and conditions affecting their use of the Class Bikes; specifically, at no point did Defendants inform Russo or members of the Wisconsin Subclass that the Class Bikes were designed with the Defect, which made them so vulnerable to theft.

286. Defendants' failure to disclose this information violated ATCP 127.64(1)(c) because the Defect constitutes a "material term[ ] and condition[ ] affecting the sale, receipt, or use" of the

Class Bikes. Indeed, not only is this information material to any prospective purchaser, but as a result of the Defect, Russo and the Wisconsin Subclass have been (or will be) deprived of the use of the Class Bikes whenever they are stolen.

287.    Additionally, Defendants violated several provisions of ATCP 127.72, because they: (i) failed to disclose material costs for which the Consumer Plaintiffs would ultimately be responsible when the Class Bikes would be stolen; (ii) misrepresented the nature, material characteristics, performance, or efficacy of the Class Bikes as it relates to products' safety and security; (iii) failed to disclose material restrictions, limitations, or conditions on the use of the Class Bikes they promoted; (iv) misrepresented the material terms of their warranty policy, which Defendants now claim does not cover damages stemming from the Class Bikes defective design; and (v) made false, deceptive, or misleading representations to Russo and the Wisconsin Subclass as described above.

288.    As a result of Defendants' myriad violations of ATCP 127, Russo and the Wisconsin Subclass have suffered pecuniary loss, including but not limited to overpaying for the Class Bikes, insurance deductibles and premiums once their Class Bikes are stolen, the cost to replace other property stolen in connection with the thefts of their motorcycles, the loss of use of their respective motorcycles, costs associated with the replacement of totaled Class Bikes and/or the diminution in value of a stolen Class Bike that was not totaled.

289.    Accordingly, Russo and the Wisconsin Subclass bring this claim for Defendants' myriad violations of ATCP through their authority under Wis. Stat. § 100.20 and seek recovery for the losses suffered—in addition to the other remedies set forth under this statute, including exemplary damages and attorneys' fees—in an amount to be determined at trial.

COUNT VII: STATUTORY MVDL VIOLATIONS PURSUANT
TO WIS. STAT. §§ 218.0116 & 218.0163(2)

290.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

291.    Russo brings this claim on behalf of himself and on behalf of the Wisconsin Subclass.

292.    Chapter 218 of the Wisconsin Statutes, Wis. Stat. §§ 218.0101 *et seq.*, regulates the conduct of various participants in the motor vehicle industry in Wisconsin, including Defendants.

293.    Indeed, Section 218.0114 of the Wisconsin Statutes requires Defendants to be licensed under Chapter 218 to sell their respective vehicles in Wisconsin through various authorized dealers:

> **(2)** *No manufacturer, importer, or distributor may engage in business as a manufacturer, importer or distributor in this state without a license therefor as provided in ss. 218.0101 to 218.0163.*
>
> **(2m)** No manufacturers', distributors' or importers' vehicles shall be sold in this state unless either the manufacturer on direct dealerships of domestic vehicles, the importer of foreign manufactured vehicles on direct dealerships or the distributor on indirect dealerships of either domestic or foreign vehicles are licensed under ss. 218.0101 to 218.0163. *The obtaining of a license* under ss. 218.0101 to 218.0163 shall conclusively establish that a manufacturer, distributor or importer is doing business in this state and *shall subject the licensee to all provisions of the Wisconsin statutes regulating manufacturers, importers and distributors*.

Wis. Stat. §§ 218.0114(2)–(2m) (emphasis added).

294.    On information and belief, Defendants have maintained their respective licenses as either manufacturers, distributors, and/or importers pursuant to Section 218.0114 for many years and well before the sale of any Class Bikes identified herein.

295.    As licensees under Chapter 218, Defendants are thus subject to "all provisions of the Wisconsin statutes regulating manufacturers, importers and distributors," including but not limited to the regulations covering the marketing and sale of the Class Bikes. Wis. Stat. § 218.0114.

296. Relevant here, Chapter 218 vests certain consumers with a civil cause of action against "a licensee" that engages in conduct proscribed by the statutory scheme:

> *Any retail buyer, lessee or prospective lessee suffering pecuniary loss because of a violation by a licensee* of s. 218.0116(1) . . . (bm), (c), (cm), . . ., (dm), (e), . . . [and] (f) . . . *may recover damages for the loss in any court of competent jurisdiction together with costs, including reasonable attorney fees.*

Wis. Stat. § 218.0163(2) (emphasis added).

297. The enumerated acts of malfeasance that give rise to a retail buyer or lessee's statutory claim against a licensee—and which independently serve as grounds to suspend or revoke an offending party's license—include situations where a licensee:

> (bm) Willfully fails to comply with any provision of ss. 218.0101 to 218.0163 or any rule or regulation promulgated under Chapter 218's implementing regulations;
>
> (c) Willfully defrauds any retail buyer, lessee or prospective lessee to the buyer's, lessee's or prospective lessee's damage;
>
> (cm) Willfully fails to perform any written agreement with any retail buyer, lessee or prospective lessee;
>
> (dm) Makes a fraudulent sale, consumer lease, prelease agreement, transaction or repossession;
>
> (e) Makes a fraudulent misrepresentation, circumvention or concealment through whatsoever subterfuge or device of any of the material particulars or the nature thereof required hereunder to be stated or furnished to the retail buyer, lessee or prospective lessee; and
>
> (f) Engages in any unconscionable practice relating to the licensed business activity.

Wis. Stat. §§ 218.0116

298. Russo and those members of the Wisconsin Subclass who purchased Class Bikes in Wisconsin are "retail buyer[s]" under the MVDL. *See* Wis. Stat. § 218.0101(31) (defining "Retail Buyer").

299. As detailed below, Defendants violated myriad provisions of Section 218.0116 that are therefore actionable pursuant to Section 218.0163(2).

300.    For instance, Section 218.0116(1)(bm) prohibits a licensee's "[w]illful failure to comply with any provision of [the MVDL] or any rule or regulation promulgated by the [WIDOT] under ss. 218.0101 to 218.0163."

301.    The MVDL's implementing regulations are codified in various provisions of Wisconsin's Administrative Code, including Chapter Trans 139 of the Code, which governs "Motor Vehicle Trade Practices." *See* Wis. Stat. Admin. Code TRANS §§ 139.01 *et seq.* ("TRANS").

302.    Section 139.03 regulates advertising and sales representations and states that "[t]he use of false, deceptive or misleading advertising or representations *by any licensee to induce the purchase of a motor vehicle constitutes an unfair practice and is prohibited.*" *See* TRANS § 139.03(1) (emphasis added).

303.    This Code section also requires a licensee to keep "detailed evidence" regarding the validity and accuracy of its advertisements and representations. *See id.* § 139.03(2) ("Any licensee, *making any statement of fact to the public* in *any advertisement or written statement or representation* concerning the motor vehicles it offers for sale, the services it provides or other aspects of its business operation, *shall possess detailed evidence of the validity and accuracy thereof*, which evidence shall be furnished to the department upon request.") (emphasis added).

304.    Relevant here, Defendants—both directly and through their authorized dealers throughout Wisconsin—repeatedly represented that the Class Bikes came equipped with their D.E.S.S.™ technology.

305.    As detailed above, however, these representations were false; the Class Bikes do not contain an immobilizer system and can be started with any other Ryker key or even a magnet.

306. Further, as explained in Russo and the Wisconsin Subclass' statutory fraud claim, Defendants engaged in a multi-year pattern of fraudulent conduct whereby—through various affirmative misrepresentations and fraudulent omissions—they defrauded Russo and other members of the Wisconsin Subclass. (*See* Count IV, *supra*.)

307. As such, Defendants' pattern of fraudulent conduct is independently actionable under Wis. Stat. § 218.0163(2) because: (i) Russo and the Wisconsin Subclass fall within the scope of those protected under the MVDL; and (ii) Defendants' fraudulent conduct violates subsections (c), (dm), and (e) of Wis. Stat. 218.0116.

308. Finally, when Defendants' actions are viewed holistically, they knew or should have known about the Defect in the Class Bikes; despite this actual or constructive knowledge, however, they continued to market and sell the Class Bikes knowing that they could be easily stolen, thus posing a risk to Russo, the Wisconsin Subclass, and other members of the community.

309. As licensees under the MVDL, Defendants knowingly peddled easy-to-steal motorcycles into the stream of commerce and now seek to disclaim liability for the increase in thefts of Class Bikes that can be stolen in direct contravention to their own advertisements. As detailed herein, this pattern of behavior is unconscionable under the circumstances, which is likewise actionable under Wis. Stat. § 218.0163(2) by operation of Wis. Stat. § 218.0116(f).

310. Russo and the Wisconsin Subclass have thus suffered pecuniary loss as a result of Defendants' violation of these MVDL provisions, including but not limited to paying insurance deductibles and premiums once the Class Bikes are stolen, the cost to replace other property stolen in connection with the thefts of these motorcycles, the loss of use of their respective Class Bikes,

64

costs associated with the replacement of the totaled Class Bikes and/or the diminution in value of the Class Bikes containing the Defect.

311.    Accordingly, Defendants, as licensees under the MVDL, are therefore liable to Russo and the Wisconsin Subclass in an amount to be determined at trial.

### COUNT VIII: STATUTORY FRAUD IN VIOLATION OF 73 P.S. §§ 201–1, *ET SEQ.*
### (Against Defendants)

312.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

313.    Harrison brings this claim on behalf of himself and on behalf of the Pennsylvania Subclass.

314.    Harrison purchased his Class Bike primarily for personal, family or household purposes within the meaning of 73 P.S. § 201–9.2.

315.    All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201–2(3).

316.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201–2(4). Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

317.    Defendants participated in unfair or deceptive trade practices that violated the Pennsylvania CPL as described below and alleged throughout the Complaint. By failing to disclose

65

the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, durable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, and stood behind their vehicles after they were sold, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Bikes. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Bikes and Defect in the course of its business.

318. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Bikes.

319. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

320. Defendants knew that the Class Bikes suffered from the Defect and were not suitable for their intended use.

321. Harrison reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of the Class Bikes and in his purchase of a Class Bike.

322. Had Harrison known that the Class Bike suffered from the Defect, he would not have purchased the Class Bike, or would have paid less for it. Harrison did not receive the benefit of their bargain as a result of Defendants' misconduct.

323. Defendants owed Harrison a duty to disclose the truth about the Defect because they: (i) possessed exclusive knowledge of the Defect; (ii) intentionally concealed it; and/or (iii) made

66

incomplete representations regarding the quality, durability, and safety of the Class Bikes, while purposefully withholding material facts from Harrison that contradicted these representations.

324. As a result of Defendants' conduct, Harrison was harmed and suffered actual damages as a result of Defendants' misrepresentations and omissions with regard to the Class Bike because he purchased a vehicle that does not perform as advertised.

325. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Harrison suffered and will continue to suffer injury in fact and/or actual damages.

326. Defendants' violations present a continuing risk to Harrison and the class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

327. Defendants are liable to Harrison and the members of the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Harrison and the members of the Pennsylvania Subclass are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**WHEREFORE,** Plaintiffs respectfully request the following relief, as allowed pursuant to the above-referenced facts, the applicable caselaw, and the governing statutes:

(A) That the Court determine that this action may be maintained as a class action and certify it as such under Rules 23(b)(2), 23(b)(3), and/or 23(c)(4) of the Federal Rules of Civil Procedure, or alternatively certify all issues, claims, and/or subclasses that are appropriately certified under Rule 23(c)(4) and Rule 23(c)(5);

(B) That the Court appoint Plaintiffs as class representatives and the undersigned counsel as class counsel as well as pre-certification interim counsel;

(C) That the Court order appropriate injunctive and/or declaratory relief, including, without limitation, an order that: (1) enjoins Defendants from continuing to misrepresent and conceal material information about the Defect and from

67

conducting business in an unfair, deceptive, and unconscionable manner as set forth herein, including their ongoing encouragement and approval of the sale of the Class Bikes; and (2) requires Defendants to repair, recall, and/or replace the Class Bikes or, at a minimum, to provide Plaintiffs and the Class with appropriate curative notice regarding the existence and cause of the Defect;

**(D)** That the Court order Defendants to disgorge all monies, revenues, and profits they wrongfully obtained as a result of their acts and practices alleged in this Complaint;

**(E)** That the Court award Plaintiffs and the Class compensatory, restitutionary, and/or statutory damages, including but not limited to the purchase and/or lease price of the Class Bikes;

**(F)** That the Court award Plaintiffs and the Class punitive and/or exemplary damages in accordance with applicable law;

**(G)** That the Court award Plaintiffs and the Class costs and attorneys' fees incurred in connection with prosecuting this action; and

**(H)** That the Court award any other relief it deems just and equitable under the circumstances, including but not limited to rescission of any applicable purchase and/or lease contracts for the Class Bikes.

### *PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE*

[SIGNATURE BLOCK ON FOLLOWING PAGE]

68

Dated this 1st day of December, 2024.

BARTON CERJAK S.C.

/s/ James B. Barton
James B. Barton
Email: jbb@bartoncerjak.com
Michael J. Cerjak
Email: mjc@bartoncerjak.com
Dustin T. Woehl
Email: dtw@bartoncerjak.com
313 North Plankinton Ave., Ste. 207
Milwaukee, WI 53203
T: (414) 877–0690
F: (414) 877–3039

SAUDER SCHELKOPF LLC
Matthew D. Schelkopf (*formal admission forthcoming*)
Email: mds@sstriallawyers.com
Joseph B. Kenney (*formal admission forthcoming*)
Email: jbk@sstriallawyers.com
1109 Lancaster Avenue
Berwyn, PA 19312
T: (610) 200–0581
F: (610) 421–1326

*Attorneys for Plaintiffs, Michael Russo,
Bruce Harrison and the Proposed Class*

69